IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORTLANDT STREET RECOVERY CORP., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| TPG TROY, LLC, T3 TROY LLC, APAX PARTNERS L.P., TPG PARTNERS IV, L.P., TPG ADVISORS IV, INC., TPG GENPAR IV, L.P., TPG ADVISORS II, INC., T3 GENPAR II, L.P., T3 PARTNERS II, L.P., and T3 PARALLEL II, L.P., | ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | | |

**COMPLAINT**

I.     OVERVIEW OF THE CASE

1.      A bleed-out is a form of financial fraud where owners of a company transfer the assets to themselves.  A scheme usually associated with organized crime, the bleed-out was carried out in this case by two large private equity firms, TPG Capital, L.P. ("TPG" or "TPG Capital") and Apax Partners, LLP ("Apax" or "Apax Partners"), on a scale so grand that it would make organized crime jealous.

2.      To bleed the Hellas Defendants (defined below) dry, the private equity firms TPG and Apax used a scheme they consider standard in their industry.  With an initial investment of €50 million, in 2005, TPG and Apax organized a group of interrelated companies to acquire a profitable, nearly debt-free company, then called Tim Hellas Telecommunications, S.A. ("TIM Hellas"), creating a complex multi-company group.  Under the control of Apax and TPG, the

1

newly formed Hellas entities borrowed heavily, paid the loan proceeds to Apax and TPG and

their investment funds, and were left debt-laden and insolvent to the detriment of their creditors,

as shown in Illustration 1.



Illustration 1
Hellas was profitable and nearly debt-free before the bleed out. It was deeply
insolvent after it paid a €1 billion purported dividend to Private Equity.

3.      One of TPG's founders explained in an interview that this kind of scheme is a

private equity method that works better when no one is watching, stating:

> Private equity. . . . It's traditionally among the most secretive of businesses, partly
> because a deal is like a poker hand, best deployed by surprise, and partly because
> the fees, and some of the industry methods, such as paying out enormous
> dividends from overleveraged acquisitions, work better when no one is watching.

4.      In 2006, Hellas Telecommunications, S.àr.l. ("Hellas"), the parent company of the

Hellas Defendants, paid Apax and TPG what purported to be a €1 billion dividend.  This would

have been a phenomenal 1900% return on the initial investment in only one year if there had

been earnings to dividend, but there were none, only losses.  Rather, the money used to pay the

purported dividend came from loans made to the Hellas Defendants.  Apax and TPG received the

proceeds of the loans and executives of TPG and Apax even signed the promissory notes and

loan indentures used to borrow money in the name of Hellas.  Upon receipt, the loan proceeds

were immediately paid to Apax and TPG and their affiliates.

5.      As a result of this "bleed-out," the Hellas Defendants are insolvent and cannot

repay the loans.  Because the loan proceeds were improperly paid to Apax and TPG, creditors

hold them responsible to repay the loans.  These creditors sue here to recover what they are owed

on the notes claiming, among other things, breach of contract, violation of civil laws against

fraudulent conveyances and unjust enrichment.

## II.      PLAINTIFF

6.      Plaintiff is Cortlandt Street Recovery Corp., a New York corporation

("Cortlandt").

7.      Plaintiff sues to collect €268,000,000, plus interest, default interest and attorneys'

fees and the other costs of suit owed under certain notes called "PIK Notes."  Until maturity, or

until an Event of Default (as defined in the PIK Notes), an interest payment may be made by a

"payment in kind," that is, by issuing additional PIK Notes to holders.  The amount claimed is

stated in Euros because the PIK Notes were issued in Euros.

8.      The PIK Notes were issued by Hellas Telecommunications Finance S.C.A.

("Hellas Finance" or "Issuer") and guaranteed by Hellas Telecommunications I, S.à r.l. ("Hellas

I" or "Guarantor").

9.      Cortlandt is the assignee directly of €130,770,266 of the PIK Notes with full

rights under the assignments to collect principal and interest due and to pursue all remedies in its

own name or in the name of all owners of the PIK Notes ("Noteholders").  The assignors of the

PIK Notes own book entry interests in the PIK Notes (the "Book Entry Interests") with the

contractual right post-default under §2.07(a) of the PIK Indenture (defined below) to exchange

the Book Entry Interests for definitive notes issued by the Issuer ("Definitive Notes").

Procedures to make the exchange provided in the PIK Indenture were never established by the defaulting Issuer and should be deemed waived to the extent issuance of Definitive Notes may be a contractual requirement to sue.

10.     Cortlandt also is authorized by vote of the majority of the Noteholders to exercise the rights of the majority under §6.05 of an indenture dated December 21, 2006 that governs the PIK Notes (the "PIK Indenture") to collect payment of the PIK Notes.

III.     DEFENDANTS

11.     Defendants in this case are companies incorporated or otherwise organized under Delaware law.  They are: TPG Troy, LLC, T3 Troy LLC, Apax Partners L.P., TPG Partners IV, L.P., TPG Advisors IV, Inc., TPG GenPar IV, L.P., TPG Advisors II, Inc., T3 GenPar II, L.P., T3 Partners II, L.P., and T3 Parallel II, L.P.

12.     (a)     The Hellas Defendants (defined below) issued the PIK Notes.  The Private Equity Defendants (together with the Hellas Defendants, the "Defendants") are the firms, funds, partners and individuals that are members of the private equity fund groups, Apax and TPG, that owned and controlled the Hellas Defendants, and who are collectively defined below.

(b)     Several entities and individuals, described in this case and included in the definition of a Defendant, are not defendants in this case.  These entities and individuals are: Hellas, Hellas I, Hellas Finance, Apax, TPG, David Bonderman, James Coulter, Martin Halusa, John Megrue, Giancarlo Aliberti, Matthias Calice, TPG Capital-N.Y., LLP, Hellas Telecommunications II, S.C.A, Apax Partners Europe Managers Limited, Apax Europe VI GP Co., Limited, Apax Europe VI GP, L.P., Apax Europe VI-A, L.P., Apax Europe VI-I, L.P., Troy, L.P. Inc., Apax WW Nominees Ltd., Hellas Telecommunications Co-Invest Ltd., Hellas Telecommunications Employees Ltd., TCW HT-Co-Invest I L.P., and TCW HT-Co-Invest II, L.P.

(c)     The entities named in ¶ 12(b) are defendants in two parallel cases pending in New York State Supreme Court under Index Nos. 651693/2010 and 653357/2011.  The wrongs alleged in this Complaint and the other two complaints are substantively the same. While not included as defendants in this case, these non-party entities and individuals are included in the definitions of the Defendants in ¶ 12(a) herein.

13.     Defendants acted in combination and agreement with one another to achieve a common purpose, namely, to borrow money as the Hellas Defendants and bleed out money to the Private Equity Defendants, thereby leaving the Hellas Defendants with inadequate assets and defrauding, hindering and delaying creditors of the Hellas Defendants from obtaining repayment of the PIK Notes.

14.     The acts alleged in this Complaint to have been done by each Defendant, were authorized, ordered or done by officers, agents, employees or representatives of the Defendants, while engaged in the management, direction, control or transaction of their business affairs.

15.     Various other corporations, organizations, firms and individuals, not made Defendants in this Complaint participated in furtherance of the violations alleged herein, and performed acts and made statements in furtherance thereof.

A.     The Hellas Defendants

16.     The Hellas Defendants and affiliates are a group of interrelated companies organized in March 2005 as part of the acquisition of TIM Hellas, a Greek cell phone company. The Hellas Defendants include:  (a) Hellas; (b) Hellas Finance; (c) Hellas I; and (d) Hellas Telecommunications II, S.C.A. ("Hellas II" and together, the "Hellas Defendants").

17.     Hellas is incorporated in Luxembourg as a private limited liability company with register number B.107.292.  Its registered offices are at 8-10, rue Mathias Hardt, L-1717 Luxembourg.

18.     Hellas Finance, issuer of the PIK Notes, is incorporated in Luxembourg as a partnership limited by shares with register number B.107.288.  Its registered offices are 8-10, rue Mathias Hardt, L-1717 Luxembourg.

19.     Hellas I is incorporated in Luxembourg as a private limited liability company with register number B.107.372.  Its registered offices are at 8-10 rue Mathias Hardt, L-1717 Luxembourg.

20.     Hellas II is incorporated in Luxembourg as a partnership limited by shares with register number B.107.372.  Its registered offices are at 8-10 rue Mathias Hardt, L-1717 Luxembourg.

21.     Hellas II issued subordinated notes ("Sub Notes") at the same time Hellas Finance issued the PIK Notes and is a transferee of fraudulent conveyances as alleged in this Complaint.

22.     Hellas is the unlimited shareholder, general partner and manager of Hellas Finance.  Hellas also is one of its two limited partners of Hellas Finance.  The other limited partner is Hellas I, Guarantor of the PIK Notes under the PIK Indenture.

23.     Hellas was the unlimited shareholder, general partner and manager of Hellas II, and one of Hellas II's two limited partners.  The other limited partner is Hellas I, guarantor of the Hellas II Sub Notes.

24.     Hellas resigned and was replaced as unlimited shareholder and general partner of Hellas II in 2009 by Hellas Telecommunications (UK) Ltd., which is registered in the U.K.; following this replacement of its general partner, Hellas II declared itself insolvent.

25.     Hellas, as unlimited shareholder, manager and general partner of Hellas Finance, Issuer of the PIK Notes, is jointly and severally liable for the obligations of Hellas Finance, including the PIK Notes.

26.     The relationship between and among the Hellas Defendants and their subsidiaries is shown below in Illustration 2.



Illustration 2
The Private Equity Defendants owned Hellas.  Hellas was the parent of Hellas I and also the unlimited shareholder, manager and general partner of Hellas Finance and Hellas II.  Hellas I guaranteed the debts of Hellas Finance.

B.     The Private Equity Defendants

27.     The Private Equity Defendants include:  (i) Apax Partners, L.L.P. ("Apax Partners"); (ii) Apax Partners, L.P. d/b/a Apax Partners of New York ("Apax-NY"); (iii) TPG Capital, L.P. ("TPG Capital"); and (iv) TPG Capital-N.Y., LLP ("TPG-NY"), which managed the Apax and TPG worldwide organizations (collectively, and together with certain individuals described below and the funds described in Group A and B below, the "Private Equity Defendants").

28.     Apax Partners and TPG Capital control the Private Equity Defendants.

29.     The Private Equity Defendants controlled, managed, and funded the Hellas Defendants and were transferees of the fraudulent conveyances alleged in this Complaint.

30.     Apax Partners is a UK limited liability partnership, with an office and place of business at 33 Jermyn Street, London, England, SW1Y 6DN.

31.     TPG Capital is organized as a limited partnership with an office and place of business at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.

32.     Apax Partners and TPG Capital each heads an integrated organization of affiliated firms, limited and general partners, managers and funds that operate as a single business entity.

33.     The PIK Notes were issued using an offering memorandum dated December 18, 2006 ("OM").

34.     The OM describes Apax as a business with over $20 billion of funds under management, which is synonymous with Apax Partners, including all of its affiliated entities, such as, Apax-NY with an office in Manhattan.

35.     Apax's first office was established in Manhattan in 1969.  Until Apax set up its second office in London in about 1981, it was Apax's only office.

36.     The OM states that a consortium of private equity investment funds controlled by Apax and TPG own Hellas.

37.     Apax Partners describes itself as the holding company and lead investment adviser for the worldwide Apax partnership, with nine offices in three continents worldwide.

38.     Apax-NY is a Delaware limited partnership with an office and place of business at 601 Lexington Avenue, 53rd Floor, New York, New York 10022.

39.     The OM describes TPG as a business with over $14 billion of funds with an additional $8 billion of affiliated funds, which is synonymous with TPG Capital and all of its affiliated entities with fourteen offices in four continents, such as, TPG-NY located in New York.

40.     TPG-NY is a limited liability partnership with an office and place of business at 888 Seventh Avenue, 38th Floor, New York, New York 10019.

41.     The Private Equity Defendants also include certain natural persons including:

    a.   Martin Halusa of Apax Partners, with an office and place of business at 15 Portland Place, London, England W1B 1PT;

    b.   John Megrue of Apax-NY, with an office and place of business at 601 Lexington Ave., 53rd Floor, New York, New York 10022;

    c.   Giancarlo Aliberti, with an office and place of business at Palazzo Gallarati Scotti, Via A. Manzoni, 30 Milan, Italy;

    d.   David Bonderman of TPG Capital, with an office and place of business at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102;

    e.   James Coulter of TPG Capital with an office and place of business at 345 California Street, Suite 3300, San Francisco, California 94104; and

    f.   Matthias Calice of TPG Capital with an office and place of business at 2nd Floor, Stirling Square, 5-7 Carlton Gardens, London, SWIY 5AD.

42.     Messrs. Halusa and Megrue as to Apax, and Bonderman and Coulter as to TPG, own, manage and control Apax and TPG worldwide, exercising control of all related entities, funds and individuals named as Defendants in this Complaint.  They are the ultimate decision makers in the Apax and TPG private equity funds that invested in Hellas and, in the case of Bonderman and Coulter, the ultimate owners of TPG and its affiliate funds.

43.     Martin Halusa is the worldwide Chief Executive Officer of Apax Partners and John Megrue is the Chief Executive Officer of Apax-NY.  Each advised and managed Apax Europe VI, described below.  Each is a transferee of proceeds constituting the fraudulent conveyances as alleged in this Complaint.

44.     David Bonderman and James Coulter are the founding partners of TPG. Bonderman is Chairman of the Board of Directors and President of the TPG funds that owned

Hellas.  Coulter is the Director and Vice President of the TPG funds that owned Hellas.  Each is a transferee of proceeds constituting the fraudulent conveyances as alleged in this Complaint.

45.     Messrs. Aliberti and Calice are the partners of Apax and TPG responsible for running the bleed-out.

46.      Aliberti is the Apax partner who leads activities in Italy, Turkey and Greece. Calice is a partner at TPG Capital who is a top level leader of TPG's operations in Europe. Aliberti and Calice signed the PIK Notes and Indenture.  They were officers of Hellas, TIM Hellas, and Hellas Finance in December 2006 and were directors of Troy GAC Telecommunications S.A. ("Troy GAC"), the corporate vehicle used to acquire TIM Hellas. Each is a transferee of proceeds of the fraudulent conveyances alleged in this Complaint.

47.     The Private Equity Defendants include two groups of private equity funds that are also Private Equity Defendants as defined herein.  These are the funds that financed and owned Hellas and were transferees of the fraudulent conveyances from Hellas.  The two groups of funds are defined here as "Group A" and "Group B."  Each fund is an association of entities that operate together with each entity and individual being an agent and principal for the others.  The entities are Defendants in this Complaint separately and as funds.

48.     Group A is three investment funds described as owners of Hellas in the PIK Indenture and related SEC filings.

    a.  Apax GP Fund is a Defendant.  As Illustration 3 shows, it consists of entities that are all Defendants, namely**:**

        1.  Apax Europe VI GP Co. Limited ("Apax GP"), a company organized under the laws of Guernsey located at 13-15 Victoria Road, St. Peter Port, Guernsey, GYI 3ZD, PO Box 431, Channel Islands;

        2.  Apax Europe VI GP, L.P. ("Apax Europe"); a Guernsey limited partnership located at 13-15 Victoria Road, St. Peter Port, Guernsey, GYI 3ZD, PO Box 431, Channel Islands;

3. Apax Partners Europe Managers Limited ("APEM"), a company organized in England located at 33 Jermyn Street, London, England SWIY 6DN.  Halusa and Megrue advised and managed Apax GP, Apax Europe, and APEM on the transactions and fraudulent conveyances.

4. Apax Europe VI-A, L.P. ("Apax VI-A"), an English limited partnership located at the Third Floor, Royal Bank Place, 1 Glategny Esplanade, St. Peter Part, Guernsey GYI 2hJ; and

5. Apax Europe VI-1, L.P. ("Apax VI-I") an English limited partnership located at the Third Floor, Royal Bank Place, 1 Glategny Esplanade, St. Peter Part, Guernsey GYI 2hJ.



Illustration 3
The Apax GP Fund entities are defendants in this action.  The general partners receive a percentage of the fund's profits and the manager receives a management fee.

b. TPG Advisors Fund is a Defendant.  As Illustration 4 shows, it consists of entities that are all Defendants, namely:

1. TPG Advisors IV, Inc. ("TPG Advisors"), a Delaware corporation located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102;

2. TPG GenPar IV, L.P. ("TPG GenPar"); a Delaware limited partnership located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102;

3. Although the manager is presently unknown to Plaintiff, Bonderman and Coulter exercised the authority of managers and owners as the directors, officers and sole shareholders of TPG Advisors Fund; and

4. TPG Partners IV, L.P. ("TPG Partners IV"), a Delaware limited partnership located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.



Illustration 4

The TPG Advisors Fund entities are defendants in this action. The general partners receive a percentage of the fund's profits and the manager receives a management fee.

c.  T3 Advisors Fund is a Defendant.  As shown in Illustration 5 shows, it consists of entities that are all Defendants:

1. TPG Advisors II, Inc. ("T3 Advisors"), a Delaware corporation located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102;

2. T3 GenPar II, L.P. ("T3 GenPar"), a Delaware limited partnership located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102;

3. Although the manager is presently unknown to Plaintiff, Bonderman and Coulter exercised the authority of managers and owners as directors, officers and sole shareholders of T3 Advisors Fund;

4. T3 Partners II, L.P. ("T3 Partners"), a Delaware limited partnership located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102; and

5. T3 Parallel II, L.P. ("T3 Parallel"), a Delaware limited partnership located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.



Illustration 5

The T3 Advisors Fund entities are defendants in this action. The general partners receive a percentage of the fund's profits and the manager receives a management fee.

49.     Group B is eight entities, described in the OM as investment funds owning the equity of Hellas.  Each is a Defendant.  They are:

1.  Troy, L.P. Inc., a company organized under the laws of Guernsey located at 13-15 Victoria Road, St. Peter Port, Guernsey, Channel Islands which owned 6,480 shares, or 41.09% of Hellas;

2.  Apax WW Nominees Ltd., a limited company organized under the laws of England and Wales located at 15 Portland Place, London, WIB 1PT United Kingdom, which owned 8 shares, or 0.05% of Hellas;

3.  TPG Troy, LLC, a Delaware limited liability company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, which owned 5,718 shares, or 36.26% of Hellas;

4.  T3 Troy, LLC, a Delaware limited liability company located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801, which owned 770 shares, or 4.88% of Hellas;

5.  Hellas Telecommunications Co-Invest Ltd., a limited company organized under the laws of the British Virgin Islands located at Maples Finance BVI Limited, Kingston Chambers, Sea Meadow House, Road Town, Tortola, BVI which owned 1,220 shares, or 7.73% of Hellas;

6. Hellas Telecommunications Employees Ltd., a limited company organized under the laws of the British Virgin Islands located at Maples Finance BVI Limited, Kingston Chambers, Sea Meadow House, Road Town, Tortola, BVI which owned 1,132 shares, or 7.18% of Hellas;

7. TCW HT-Co-Invest I L.P., a limited partnership registered in the Cayman Islands located at M&C Corporate Services Limited, Ugland House, South Church Street, B.P., George Town, Grand Cayman which owned 382 shares, or 2.42% of Hellas; and

8. TCW HT Co-Invest II L.P., a limited partnership registered in the Cayman Islands located at M&C Corporate Services Limited, Ugland House, South Church Street, P.O. Box 309, B.P., George Town, Grand Cayman which owned 59 ordinary shares, or 0.37% of Hellas.

## IV.     JURISDICTION AND VENUE

50.     This Court has jurisdiction over this action under 28 U.S.C. §1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states in which a citizen of a foreign state is an additional party.

51.     Venue is proper in this judicial district under 28 U.S.C. §1391 because defendants reside, transact business or are found in this District.

## V.     STATEMENT OF FACTS

A.     The PIK Notes are in Default; The Amount Due is €268,000,000 Plus Interest, Fees and Costs

52.     Plaintiff sues to collect amounts due under the PIK Notes that were issued on December 21, 2006 by Hellas Finance and guaranteed by Hellas I.

53.     The series of notes are the Hellas Telecommunications Finance PIK Notes due 2015.

54.     The PIK Notes were issued under the PIK Indenture dated December 21, 2006.

55.     The PIK Notes issued total €268,000,000 which is due plus interest, default interest, Trustee fees, attorneys' fees and costs.

56.    The amount due under the PIK Notes is the amount Hellas Finance stated was due and payable in its December 31, 2009 financial statements.

57.    On November 27, 2009, the Trustee gave notice under the PIK Indenture that an Event of Default had occurred and accelerated payment of the PIK Notes, declaring all outstanding principal and interest due and immediately payable as provided in the PIK Indenture in the event of a default.  The PIK Notes were not paid.

58.    Section 18 of the PIK Notes and §14.08 of the PIK Indenture provide:  The internal law of the state of New York will govern and be used to construe this Indenture, the Notes and the Guarantee without giving effect to applicable principles of conflicts of law to the extent that the application of the laws of another jurisdiction would be required thereby.

B.    The Private Equity Defendants Acquire a Profitable, Nearly Debt-Free Company and Load it with Debt

59.    In June 2005, the Private Equity Defendants acquired a cell phone company in Greece, TIM Hellas, and created a complex, multi-company corporate group to own the Greek company with Hellas as the parent company.

60.    Until the Private Equity Defendants acquired it, TIM Hellas was profitable and nearly debt-free.  It was incorporated in Greece on July 28, 1992 as a *société anonyme*.  At the start of 2005, it was the third-largest cell phone company in Greece.

61.    In 2004, TIM Hellas's profits were €78.8 million.  On June 30, 2005, after acquisition by the Private Equity Defendants, its debt totaled €166 million and shareholders' equity was €491 million.

62.    In March 2005, the Private Equity Defendants incorporated Hellas, Hellas I and Hellas II in Luxembourg.

63.     On March 28, 2005, the Private Equity Defendants, acquired Troy GAC to use as the corporate vehicle to acquire TIM Hellas.  Hellas, Hellas I and Hellas II became the direct owners of Troy GAC.

64.     On April 3, 2005, TIM Hellas's majority shareholder, TIM International N.V., signed an agreement with Troy GAC to sell its 81% of equity in TIM Hellas.

65.     On June 15, 2005, the purchase of 81% of equity from Troy GAC was completed for €1,114 billion.  The Private Equity Defendants contributed €50 million in equity for the purchase.  The rest of the funding was borrowed from JP Morgan and Deutsche Bank.

C.      Under the Control of the Private Equity Defendants, the Hellas Defendants Issue
        Securities to Themselves

66.     In connection with the acquisition of TIM Hellas, each of the Hellas Defendants issued securities to their shareholders called PECs ("Preferred Equity Certificates") and CPECs ("Convertible Preferred Equity Certificates").

67.     Hellas II issued PECs and CPECs to Hellas I.  Hellas I issued PECs and CPECs to Hellas.  Hellas issued PECs and CPECs to the Private Equity Defendants in proportion to the common shares owned.

68.     Between June 2005 and January 2006, Hellas, Hellas I and Hellas II issued CPECs in substantial amounts.  For example, Hellas I issued 773,000 CPECs to Hellas, for a total of €77,300,000.  By 2006, after reducing par value to €1 per CPEC and adjusting the number of CPECs, Hellas I had 77.3 million CPECs outstanding.

69.     Between June 2005 and January 2006, Hellas and Hellas II also issued PECs in substantial amounts.  For example, a total of €311,000,000 PECs were issued by Hellas I to Hellas.

70.     PECs and CPECs issued by Hellas, Hellas I and Hellas II ranked alongside common shares in priority of payment, that is, they were subordinate to all other present and future obligations of the Hellas Defendants with respect to payment, redemption and liquidation.

71.     On November 3, 2005, the Private Equity Defendants acquired the remaining 19% of TIM Hellas in a cash-out merger for €263.5 million.  When the merger was complete, the Private Equity Defendants merged TIM Hellas into Troy GAC and Troy GAC changed its name to TIM Hellas Telecommunications, S.A.

72.     The total price the Private Equity Defendants paid for Troy GAC was approximately €1.4 billion.  The excess of the purchase price over the value assigned to the net assets purchased was accounted for as intangible assets on Hellas's balance sheet called "Goodwill", which was €610,000,000 on December 31, 2005.

73.     By year end 2005, Hellas and its affiliates owed about €1.6 billion in debts. Shareholders' equity was €38,028,000, and retained earnings were zero.

74.     On January 31, 2006, the Private Equity Defendants acquired Q-Telecom, another cell phone business in Greece.  The cost of the acquisition was €355 million.

75.     To purchase Q-Telecom, the Private Equity Defendants contributed €29 million in exchange for CPECs and €111 million in exchange for PECs.  The balance of €215 million was borrowed.

D.     Securities the Private Equity Defendants Issue to Themselves Prohibit Distributions Before all Other Outstanding Liabilities are Settled

76.     PECs affirmatively prohibited any payment in redemption unless or until the issuer had sufficient funds available to settle all of its other liabilities.

77.     PECs were treated as a long term liability in the financial statements of Hellas, Hellas I and Hellas II.

78.     CPECs affirmatively prohibited any payment in redemption unless or until the issuer had sufficient available funds to settle all of its other liabilities.

79.     CPECs were presented as equity in the financial statements of Hellas, Hellas I and Hellas II.

80.     A CPEC was a form of equity.  It could only be converted into common shares. There was no obligation to make a payment to a holder of a CPEC.  There was no yield, no interest rate, no obligation to redeem, and no act that could result in a default.

81.     A PEC was a form of preferred stock.  It did not impose an obligation on the issuer to make a payment to a holder of a PEC.  Although a PEC had a 12% yield, it did not have to be paid.  A PEC matured in 2035, but even then a PEC did not require any payment.

E.     The Hellas Defendants are Insolvent by Early 2006 But Borrow More and Make
       Improper Distributions on the Securities Issued to the Private Equity Defendants

82.     By the first quarter of 2006, the assets Hellas owned were inadequate to pay its liabilities and the Hellas Defendants were insolvent.  Its financial statements reported that it was losing money on both an annual income statement and cash flow basis so its operating income was inadequate to service its debts.

83.     In April 2006, Hellas I redeemed €333,159,000 PECs from Hellas at par plus accrued interest.

84.     For mid-year 2006, Hellas reported shareholders' equity of €11.4 million, with no retained earnings, an accumulated deficit of €55.9 million, and long term debt of almost €2 billion.  By mid-year 2006, only €1,646,146,000 in tangible assets existed to pay €2,485,133,000 in liabilities, including €1,936,450,000 of long term debt. Throughout 2006, Hellas lost money because its operating income was inadequate to pay its massive debts.

85.     By year-end 2006, shareholders' equity fell into a substantial deficit of more than

€1 billion, as shown below in Illustration 6:



Illustration 6

Hellas was insolvent in 2006. Nonetheless, it redeemed CPECs from shareholders resulting in a €1 billion deficit by year-end 2006.

86.     TIM Hellas was profitable before it was acquired by the Private Equity

Defendants but became very unprofitable because of the burden of servicing the billions of euros

in debts incurred.  Interest expense had exceeded net income by the beginning of 2006, as shown

in Illustration 7:

(INTENTIONALLY LEFT BLANK)



Illustration 7

Interest expense on billions of euros of debt made TIM Hellas unprofitable by year-end 2005.

F.    Hellas Finance Issues the PIK Notes and Proceeds are Paid to the Private Equity Defendants

87.    On December 18, 2006, Hellas published the OM for issuance of €200 million of PIK Notes by Hellas Finance, and an OM for issuance of the Subordinated Notes by Hellas II.

88.    On December 21, 2006, Hellas borrowed approximately €1.5 billion through issuance of the PIK Notes and Subordinated Notes of Hellas II.

89.    From the proceeds of the PIK Notes and the Subordinated Notes, approximately €1.185 billion were paid to the Private Equity Defendants and, of that amount, the Private Equity Defendants received a €46,285,000 dividend on an initial investment of €50 million.

90.    On December 21, 2006, Hellas II redeemed 27.3 million CPECs issued to and held by Hellas I for €979,000,000; Hellas I redeemed 27.4 million CPECs issued to and held by Hellas for €973,700,000; and Hellas redeemed 27.4 million CPECs issued to and held by the Private Equity Defendants for €973,657,610.

91.     Hellas also redeemed PECs issued to and held by the Private Equity Defendants for €211,660,427.  Total payments to the Private Equity Defendants were at least €1,185,318,037.  Hellas reported €946,284,610 of the payments as a dividend to shareholders.

92.     The €973,700,000 Hellas I paid to redeem CPECs, the €979,000,000 Hellas II paid to redeem CPECs, and the €973,657,610 Hellas paid to redeem CPECs placed a value on a CPEC of thirty-five times par value.

93.     The redemption value of thirty five times par was supposedly established, according to the OM, by Hellas, Hellas I and Hellas II by appraisal, but the only appraisal that exists is a December 18, 2006 valuation of Hellas II of €2.8 million issued just three days before Hellas II paid a €946,284,610 dividend to Hellas I.  This appraisal was audited by Hellas's auditor, Ernst & Young.

94.     The audited appraisal of €2.8 million indicates, based on that valuation, a maximum value of a CPEC at 10¢.  The redemption payments on December 21, therefore, were more than 350 times the value of CPECs on December 18 based on Hellas II's audited appraisal and produced a €1 billion euro deficit as shown below in Illustration 8.

(INTENTIONALLY LEFT BLANK)



Illustration 8

At 350 times the audited appraised value, the CPEC redemption payments produced a €1 billion deficit.

95.     The money borrowed by Hellas Finance flowed to the Private Equity Defendants by a circuitous route as shown below in Illustration 9:



Illustration 9

The money borrowed by Hellas Finance flowed to the Private Equity Defendants by a circuitous route.

    a.   Hellas Finance conveyed the €200 million proceeds of the PIK Notes to Hellas I;

    b.   Hellas I then conveyed the €200 million in proceeds from the Hellas Finance PIK Notes to Hellas II;

    c.   Hellas II combined the €200 million in proceeds from the Hellas Finance PIK Notes with more than €1.2 billion Hellas II borrowed by issuing its own notes. Hellas II then conveyed the money to Hellas I in redemption of CPECs and PECs that Hellas II issued and Hellas I owned;

    d.   Hellas I conveyed the money to Hellas in redemption of CPECs that Hellas I issued and Hellas owned;

    e.   Hellas conveyed the money to the Private Equity Defendants in redemption of CPECs that Hellas had issued and the Private Equity Defendants owned; and

    f.   The Private Equity Defendants received the money from the redemptions and divvied it up among themselves.

G.    <u>The Distributions Were Prohibited by the Terms of the Securities the Private Equity Defendants Issued to Themselves</u>

96.    The terms of the CPECs represented in the OM and PIK Indenture prohibited

redemptions where debts senior to CPECs existed and had to be paid or provided for payment.

The PECs were represented in the OM to be subject to the same prohibition.

97.    For example, the OM states:

> The Company has the right but not the obligation to convert any or all the CPECs into shares of the company (one CPEC for one common share) with conversion price equal to the par value of €100 per CPEC.  <u>Once the company does not have any other debt liability to pay for or to provide for, with priority to the CPECs, it has the option to redeem</u> CPECs at the greater of par value and market value reduced by 0.5%.  The company accounts for the CPECs as equity.

(Emphasis added.)

98.    In 2006, Hellas, Hellas Finance, and Hellas I did not have any current net income,

retained earnings, or paid-in share capital that each or any could distribute to its shareholders.

99.    Hellas Finance admitted insolvency in its 2009 financial statements.

VI.   CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF:
AGAINST HELLAS FINANCE (ISSUER), HELLAS I (GUARANTOR)
AND HELLAS (GENERAL PARTNER) FOR PAYMENT OF PIK NOTES

100.   Plaintiff repeats and realleges paragraphs 1-99, above as if fully set forth herein.

101.   The elements of a claim to recover on a promissory note are:

    a.   Evidence of a note;

    b.   Execution and delivery by issuer for value;

    c.   Refusal to make payment;

    d.   Plaintiff's authority to recover as or on behalf of the owner; and

    e.   The amount due.

102.   The Noteholders are holders of the PIK Notes described above which were executed and delivered in exchange for €200,000,000 on or about December 21, 2006.

103.   Hellas Finance issued the PIK Notes and Hellas I guaranteed payment of the PIK Notes.

104.   The Noteholders fully performed their obligations under the PIK Notes by paying €200,000,000 to Hellas Finance.

105.   On November 27, 2009, the Trustee issued notice of one or more Events of Default under the PIK Notes and Indenture stating that all outstanding PIK Notes were due and payable immediately under the terms of the PIK Indenture without further action or notice.

106.   Despite the demand, the issuer (Hellas Finance), Guarantor (Hellas I) and the issuer's general partner (Hellas) failed to pay the amounts due under the PIK Notes.

107.   The financial statements of Hellas Finance, Hellas I and Hellas admit that specific Events of Defaults occurred under the PIK Notes and PIK Indenture.

24

108.   The Trustee under the PIK Indenture is authorized to sue and collect on the PIK Notes on behalf of all persons with an interest in the Notes.

109.   Cortlandt is authorized by assignments of owners of Book Entry Interests and by vote of a majority of the Nonparticipants and Participants in accordance with the terms of the PIK Indenture to collect payment of the PIK Notes.

110.   As of November 27, 2009, the principal amount due on the PIK Notes was €268,000,000 including the original amount issued, plus additional notes issued in payment of quarterly interest until October 15, 2009.  The total PIK Notes issued are €268,000,000.

111.   In addition, interest is owed from October 15, 2009 to November 27, 2009 at Euribor plus 8%.  Default interest is owed from November 27, 2009 to the date payment is made at Euribor plus 9% and Trustee's fees, attorneys' fees and the costs and expenses of collection are owed under the terms of the PIK Indenture.

112.   For failure of Hellas Finance to pay, Hellas I, as Guarantor under the terms in the PIK Notes and the PIK Indenture, is liable to pay the PIK Notes.

113.   As a result of the above defaults, Plaintiff has been damaged in the amount of €268,000,000 plus interest, default interest, Trustee fees, attorney's fees, costs and expenses.

<div align="center">
SECOND CLAIM FOR RELIEF:<br>
AGAINST ALL DEFENDANTS<br>
FOR BREACH OF CONTRACT
</div>

114.   Plaintiff repeats and realleges paragraphs 1-113, above, as specifically set forth herein.

115.   The elements of a cause of action for breach of contract are the existence of a contract, the performance of one party under that contract, a breach by the other party, and resulting damages.

116.     Representatives of the Private Equity Defendants signed the PIK Notes and the PIK Indenture and controlled the contents of the OM.

117.     The PIK Notes were issued subject to the terms and conditions in the OM, PIK Notes, and PIK Indenture, documents that each separately and together constitute a contract, and which collectively provide that

    a.   The PIK Notes are senior to all securities of Hellas held by the Private Equity Defendants and all securities held by shareholders of Hellas I and Hellas II;

    b.   PECs and CPECs were securities held by shareholders of each Hellas Defendant;

    c.   The Private Equity Defendants have no right to a redemption or other distribution relating to PECs and CPECs; and

    d.   Each Hellas Defendant was prohibited from making any redemption or other distribution relating to PECs and CPECs unless first paying or providing for payment of the PIK Notes.

118.     The PIK Notes were delivered in exchange for €200,000,000 on or about December 21, 2006.

119.     The Noteholders fully performed their obligations under the PIK Notes by paying €200,000,000 to Hellas Finance.

120.     The Defendants breached the PIK Notes, the PIK Indenture and the OM by making payments to the Hellas Defendants in redemption of PECs and CPECs, which were payments accepted by the Private Equity Defendants, without paying or providing for payment of the PIK Notes.

121.     Noteholders were injured by the Defendants' breach of contract because payments made as distributions to the Private Equity Defendants left the Hellas Defendants insolvent and unable to pay the Noteholders.

122.     As a result of the breach, the Noteholders suffered damages in the amount of the

PIK Notes issued, €268,000,000, plus interest and default interest from October 15, 2009, plus

Trustee's fees, attorneys' fees and the costs and disbursement of this action.

THIRD CLAIM FOR RELIEF:
AGAINST ALL DEFENDANTS FOR
VIOLATION OF PROHIBITIONS ON DISTRIBUTIONS

123.     Plaintiff repeats and realleges paragraphs 1-122, above, as specifically set forth

herein.

124.     A corporation may not pay dividends or make other distributions to shareholders,

if the corporation is insolvent or would be made insolvent by the dividend or other distribution.

125.     A corporation may only pay dividends and other distributions to its shareholders

either:

    a.  Out of surplus, so that the net assets of the corporation remaining after such declaration, payment or distribution shall at least equal the amount of its stated capital; or

    b.  In case there is no surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.

126.     Prohibitions and restrictions on dividends and distributions to shareholders of a

corporation are found in the statutes of states and nations worldwide.

127.     In New York, BCL §§ 510, 513, 629, 719 and N.Y. Penal § 190.35 impose these

prohibitions and restrictions and authorize a creditor's suit to enforce them.

128.     In Luxembourg, Companies Law Articles 49-2, 49-8, 72-1, 72-2, 153, 157, 167

and 201 impose these prohibitions and restrictions and authorize a creditor's suit to enforce

them.

129.     The PECs and CPECs that the Hellas Defendants issued were securities owned

only by their shareholders and in proportion to ownership of common shares.

27

130.     The redemptions of PECs and CPECs in 2006 were paid from borrowed money where the Hellas Defendants did not have annual net profits or surplus to distribute to shareholders and after Hellas was already insolvent with assets inadequate to pay its liabilities. The distributions in December 2006, which included what purported to be a €946,000,000 dividend, created a €1,000,000,000 deficit deepening an insolvency that existed by the first quarter of 2006.

131.     The distributions violated statutory restrictions and prohibitions for each distribution from one Hellas Defendant to another and to the Private Equity Defendants considering each distribution separately or as a single transaction.

132.     The Private Equity Defendants who are the ultimate recipients of the distributions are liable to creditors to return the distributions that each received in an amount sufficient to satisfy Plaintiff's claims.

133.     As a result, the Private Equity Defendants are liable to Noteholders in the amount of €268,000,000 plus interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of this action.

<div align="center">

FOURTH CLAIM FOR RELIEF:
AGAINST THE PRIVATE EQUITY DEFENDANTS AS ALTER EGOS
<u>FOR PAYMENT OF THE PIK NOTES</u>

</div>

134.     Plaintiff repeats and realleges paragraphs 1-133, above, as if fully set forth herein.

135.     In order to hold owners liable for the acts of their corporation: (a) the owners must exercise complete control, not only of finances but of policy and business practices so that the corporate entity as to the transaction had no separate mind, will or existence of its own; (b) such control must have been used to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's

legal rights; and (c) the aforesaid control and breach of duty must proximately cause injury or unjust loss complained of.

136.    At the direction and under the control of the Private Equity Defendants, the Hellas Defendants borrowed money through the PIK Notes with no intention of repaying the loans and transferred the loan proceeds to their owners, the Private Equity Defendants, in a series of fraudulent conveyances as described above.

137.    Courts consider all the facts in determining whether to pierce the corporate veil and impose alter ego liability on owners such as the Private Equity Defendants, including the following facts present here:

    a.   The Private Equity Defendants owned 100% of the Hellas Defendants;

    b.   Representatives of the Private Equity Defendants were the managing directors of Hellas and Hellas controlled Hellas Finance as unlimited shareholder, general partner and manager;

    c.   The Private Equity Defendants controlled the terms and, by their representatives, signed the PIK Notes and Indenture and borrowed money to pay to themselves;

    d.   No one in management protested transactions that had no corporate benefit because management were representatives of the Private Equity Defendants and the money borrowed went into the pockets of the Private Equity Defendants;

    e.   The Private Equity Defendants did not treat the Hellas Defendants as profit centers independent of the Private Equity Defendants;

    f.   The Hellas Defendants were forced to commit business suicide by paying borrowed funds to the Private Equity Defendants that the Hellas Defendants could not repay;

    g.   The Hellas Defendants redeemed securities from the Private Equity Defendants where the Hellas Defendants had no obligation to pay and the Private Equity Defendants had no right to receive payment;

    h.   The borrowings and payments to the Private Equity Defendants were implemented by a complex series of choreographed and interrelated actions

between and among the Hellas Defendants under the control of the Private Equity Defendants to obscure the substance of such transactions;

i.    The Hellas Defendants were inadequately capitalized and by the first quarter of 2006 were unable to pay their debts as they became due;

j.    The Private Equity Defendants did not deal with the Hellas Defendants at arm's length; no corporation acting in its own interests would use loans to redeem securities on which they owed zero at 35 times par and characterize the distribution as a €946,285,000 dividend to owners; and

k.    The Private Equity Defendants treated and disposed of the corporate loans as if it was their own money.

138.    As a result, the Private Equity Defendants are liable to Noteholders in the amount of €268,000,000 plus interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of this action.

FIFTH CLAIM FOR RELIEF:
AGAINST ALL DEFENDANTS FOR
CONVEYANCES BY INSOLVENTS (DCL § 273)

139.    Plaintiff repeats and realleges paragraphs 1-138, above, as specifically set forth herein.

140.    Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

141.    The Hellas Defendants engaged in a series of conveyances which, individually and as a whole, were incurred without a fair consideration, and rendered the Hellas Defendants, individually and as a whole, insolvent.

142.    The substance of the conveyances was to borrow money in the name of a corporation to convey to the corporation's owners for no consideration.

143.    The conveyances made without a fair consideration are:

    a.   The transfer of the €200,000,000 proceeds of the PIK Notes due 2015 from Hellas Finance to Hellas I for no consideration;

    b.   The transfer of the €200,000,000 proceeds of the PIK Notes from Hellas I to Hellas II for no consideration;

    c.   The transfer of the €200,000,000 proceeds of the PIK Notes, as part of a larger distribution from Hellas II to Hellas I, in exchange for CPECs, a security that imposed no obligation on Hellas II to repay anything at any time;

    d.   The transfer of the €200,000,000 proceeds of the PIK Notes, as part of a larger distribution from Hellas I to Hellas in exchange for CPECs, a security that imposed no obligation on Hellas I to repay anything at any time; and

    e.   The transfer of the €200,000,000 proceeds of the PIK Notes from Hellas to its owners, the Private Equity Defendants, in exchange for CPECs, a security that imposed no obligation on Hellas to repay anything at any time.

144.    The conveyances considered individually were made when Hellas Finance was insolvent, when Hellas II was insolvent, when Hellas I was insolvent and when Hellas was insolvent, and considered as a whole, when all of the Hellas Defendants were insolvent.

145.    The ultimate transferees of the conveyances were the Private Equity Defendants who divided the money among themselves.

146.    The Noteholders are damaged by nonpayment of the PIK Notes in the amount of €268,000,000 plus interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of the action.

147.    Where, as here, conveyances are fraudulent as to creditors (Noteholders of the PIK Notes) the creditors are entitled, as against any person (except a purchaser for fair consideration without knowledge of the fraud), to a judgment:

    a.   To have the conveyances set aside and annulled to the extent necessary to satisfy their claims,

    b.   To disregard the conveyances and attach or levy execution from Defendants upon the property conveyed, or

    c.  For application of the rules of law and equity and, in particular, the rules
relating to the law of principal and agent, and the effect of fraud,
misrepresentation, bankruptcy or other invalidating cause until the PIK
Noteholders recover their damages .

<div align="center">

SIXTH CLAIM FOR RELIEF:
AGAINST ALL DEFENDANTS FOR
CONVEYANCES BY PERSONS IN BUSINESS (DCL§ 274)

</div>

148.    Plaintiff repeats and realleges paragraphs 1-147, above, as specifically set forth herein.

149.    Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

150.    The conveyances were made without fair consideration as alleged in the Complaint, where the individual corporations making the conveyances individually and as a group were left an unreasonably small capital.

151.    The ultimate transferees of the conveyances were the Private Equity Defendants who divided the money among themselves.

152.    The conveyances were fraudulent as to creditors, including Noteholders who became creditors during the course of the transactions, without regard to the actual intent of defendants.

153.    The Noteholders are damaged by nonpayment of the PIK Notes in the amount of €268,000,000 with interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of the action.

<div align="center">32</div>

154.    Where, as here, conveyances are fraudulent as to creditors, including the

Noteholders, they are entitled, as against any person (except a purchaser for fair consideration

without knowledge of the fraud), to a judgment

    a.   To have the conveyances set aside and annulled to the extent necessary to
        satisfy their claims,

    b.   To disregard the conveyances and attach or levy execution from Defendants
        upon the property conveyed, or

    c.   For application of the rules of law and equity and, in particular, the rules
        relating to the law of principal and agent, and the effect of fraud,
        misrepresentation, bankruptcy or other invalidating cause until the PIK
        Noteholders recover their damages.

SEVENTH CLAIM FOR RELIEF:
AGAINST ALL DEFENDANTS FOR CONVEYANCES MADE WITH INTENT
TO INCUR DEBT BEYOND THE ABILITY TO PAY (DCL §275)

155.    Plaintiff repeats and realleges paragraphs 1-154, above, as specifically set forth

herein.

156.    Every conveyance made and every obligation incurred without fair consideration

when the person making the conveyance or entering into the obligation intends or believes that

he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and

future creditors.

157.    The Hellas Defendants made conveyances and incurred obligations without fair

consideration as alleged in the Complaint, intending or believing that each and all of the Hellas

Defendants would incur debts beyond the ability of each and all of them to repay as they mature.

158.    The conveyances, separately and together, were fraudulent as to both present and

future creditors, including the Noteholders, because when the conveyances occurred all

Defendants knew from the first quarter of 2006 that the debts incurred by the Hellas Defendants

were beyond their ability to pay as they matured and the Private Equity Defendants intended for

the Hellas Defendants to borrow even more money they could not repay for the purpose of conveying the money to the Private Equity Defendants.

159.    The Noteholders are injured by nonpayment of the Notes in the amount of €268,000,000 with interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of the action.

160.    Where, as here, conveyances are fraudulent as to creditors, including Noteholders, the creditors are entitled, as against any person (except a purchaser for fair consideration without knowledge of the fraud), to a judgment

    a.  To have the conveyances set aside and annulled to the extent necessary to satisfy their claims,

    b.  To disregard the conveyances and attach or levy execution from Defendants upon the property conveyed, or

    c.  For application of the rules of law and equity and, in particular, the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, bankruptcy or other invalidating cause until the PIK Noteholders recover their damages.

EIGHTH CLAIM FOR RELIEF:
AGAINST ALL DEFENDANTS FOR
INTENTIONAL FRAUDULENT CONVEYANCES (DCL § 276)

161.    Plaintiff repeats and realleges paragraphs 1-160, above, as specifically set forth herein.

162.    Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

163.    Defendants individually and under the control and at the direction of other Defendants herein made conveyances with actual intent to hinder, delay, and defraud creditors by borrowing in the name of a company, conveying the proceeds to the owners of the company

and those owners conveying the proceeds to other Defendants and ultimately to owners of the

Private Equity Defendants and to limited partners using the corporate form of the debt to try to

insulate Defendants from liability, thereby engaging in a series of intentional fraudulent

conveyances to the injury of present and future creditors, including the Noteholders.

164.    The conveyances made with actual intent to hinder, delay, and defraud creditors

include:

a.  The transfer of the €200,000,000 proceeds of the PIK Notes due 2015 from
    Hellas Finance to Hellas I for no consideration;

b.  The transfer of the €200,000,000 proceeds of the PIK Notes from Hellas I to
    Hellas II for no consideration;

c.  The transfer of the €200,000,000 proceeds of the PIK Notes, as part of a larger
    distribution from Hellas II to Hellas I, in exchange for CPECs, a security that
    imposed no obligation on Hellas II to repay anything at any time;

d.  The transfer of the €200,000,000 proceeds of the PIK Notes, as part of a larger
    distribution from Hellas I to Hellas in exchange for CPECs, a security that
    imposed no obligation on Hellas I to repay anything at any time; and

e.  The transfer of the €200,000,000 proceeds of the PIK Notes from Hellas to its
    owners, the Private Equity Defendants, in exchange for CPECs, a security that
    imposed no obligation on Hellas to repay anything at any time.

165.    Defendants acted with actual intent to hinder, delay, or defraud creditors because,

among other things:

a.  The transfers were made where the company had no obligation to redeem
    securities from shareholders, so there was bad faith by both the transferors
    that paid and transferees that knew there was no obligation to pay;

b.  The transfers were not made in the ordinary course of business;

c.  Before the transfers, Defendants knew of their obligations under the PIK
    Indenture and PIK Notes;

d.  Before the transfers, Defendants knew that Hellas's remaining assets after the
    transfers would be inadequate to satisfy future claims by Noteholders; and

     e.  Loans and payments were made by a complex series of choreographed and interrelated actions by the Hellas Defendants for the purpose of paying owners the proceeds of loans incurred by the corporations they owned.

166.    The Noteholders are damaged by nonpayment of the Notes in the amount of €268,000,000 with interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of the action.

167.    Where, as here, conveyances are fraudulent as to creditors, including Noteholders, the creditors are entitled, as against any person (except a purchaser for fair consideration without knowledge of the fraud), to a judgment

     a.  To have the conveyances set aside and annulled to the extent necessary to satisfy their claims,

     b.  To disregard the conveyances and attach or levy execution from defendants upon the property conveyed, or

     c.  For application of the rules of law and equity and, in particular, the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, bankruptcy or other invalidating cause until the PIK Noteholders recover their damages.

<div align="center">

NINTH CLAIM FOR RELIEF:
AGAINST ALL DEFENDANTS FOR
CONVEYANCES OF PARTNERSHIP PROPERTY (DCL § 277)

</div>

168.    Plaintiff repeats and realleges paragraphs 1-167, above, as specifically set forth herein.

169.    Every conveyance of partnership property and every partnership obligation incurred when the partnership is or will be thereby rendered insolvent, is fraudulent as to partnership creditors, if the conveyance is made or obligation is incurred: (a) to a partner, whether with or without a promise by him to pay partnership debts, or (b) to a person not a partner without fair consideration to the partnership as distinguished from consideration to the individual partners.

170.    Noteholders are creditors of Hellas Finance, a partnership with shares in which Hellas is the unlimited shareholder and general partner, as well as its manager.

171.    Hellas Finance and its general partner, Hellas, made conveyances that are fraudulent as to partnership creditors, the Noteholders.

172.    Hellas Finance conveyed partnership property rendering itself insolvent, namely, the proceeds of the PIK Notes to Hellas, its general partner, without a promise by Hellas to pay the partnership's debt in a transaction in which the proceeds were then conveyed without fair consideration by Hellas to its non-partner shareholders and their partners and investors, the Private Equity Defendants.

173.    The Noteholders are damaged by nonpayment of the Notes in the amount of €268,000,000 with interest and default interest from October 15, 2009, plus Trustee's fees, attorneys' fees and the costs and disbursement of the action.

174.    Where, as here, conveyances are fraudulent as to creditors, including Noteholders, the creditors are entitled, as against any person (except a purchaser for fair consideration without knowledge of the fraud), to a judgment

    a.   To have the conveyances set aside and annulled to the extent necessary to satisfy their claims,

    b.   To disregard the conveyances and attach or levy execution from defendants upon the property conveyed, or

    c.   For application of the rules of law and equity and, in particular, the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, bankruptcy or other invalidating cause until the Noteholders recover their damages.

### TENTH CLAIM FOR RELIEF:
### AGAINST THE PRIVATE EQUITY DEFENDANTS FOR
### <u>UNJUST ENRICHMENT AND IMPOSITION OF A CONSTRUCTIVE TRUST</u>

175.    Plaintiff repeats and realleges paragraphs 1-174, above, as specifically set forth herein.

176.    The elements of an unjust enrichment claim are (1) the defendant was enriched, (2) at plaintiff's expense and (3) it is against equity and good conscience to permit the other party to retain what is sought to be recovered.

177.    The Private Equity Defendants who were the owners of the Hellas Defendants were enriched by the conveyance of the proceeds of money borrowed by Hellas Finance by issuing the PIK Notes.

178.    The benefit to the Private Equity Defendants was at the expense of the Noteholders who cannot recover the amounts due on the PIK Notes because the Hellas Defendants are insolvent.

179.    It is against equity and good conscience to permit the owners of a corporation to enrich themselves by appropriating money borrowed by the corporation at the expense of the creditors who loaned the money.

180.    As a result, the Court should impose a constructive trust over all the funds and other benefits the Private Equity Defendants received, and order them to disgorge to Noteholders funds sufficient to pay amounts due under the PIK Notes.

### VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff prays for judgment against defendants on each cause of action:

A.  On the First Claim for Relief against Hellas Finance, Hellas I and Hellas for payment of PIK Notes in the amount of €268,000,000 with interest at Euribor plus 8% from October 15,

2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

      B.  On the Second Claim for Relief against All Defendants for breach of contract in the amount of €268,000,000 with interest at Euribor plus 8% from October 15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

      C.  On the Third Claim for Relief against All Defendants for violation of prohibitions on distributions in the amount of €268,000,000 with interest at Euribor plus 8% from October 15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

      D.  On the Fourth Claim for Relief against the Private Equity Defendants for payment of the PIK Notes as alter egos in the amount of €268,000,000 with interest at Euribor plus 8% from October 15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

      E.  On the Fifth Claim for Relief against All Defendants for conveyance by insolvents setting aside and annulling the conveyances to the extent necessary to satisfy the claims for payment of PIK Notes or disregarding the conveyances and attach or levy execution from defendants upon the property conveyed to the extent necessary to satisfy plaintiff's claims or for application of the rules of law and equity to collect sufficient funds from defendants to satisfy plaintiff's claims in the amount of €268,000,000 with interest at Euribor plus 8% from October

15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

F.   On the Sixth Claim for Relief against All Defendants for conveyances by persons in business setting aside and annulling the conveyances to the extent necessary to satisfy the claims for payment of PIK Notes or disregarding the conveyances and attach or levy execution from defendants upon the property conveyed to the extent necessary to satisfy plaintiff's claims or for application of the rules of law and equity to collect sufficient funds from defendants to satisfy plaintiff's claims in the amount of €268,000,000 with interest at Euribor plus 8% from October 15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

G.   On the Seventh Claim for Relief against All Defendants for conveyances made with intent to incur debt beyond the ability to pay setting aside and annulling the conveyances to the extent necessary to satisfy the claims for payment of PIK Notes or disregarding the conveyances and attach or levy execution from defendants upon the property conveyed to the extent necessary to satisfy plaintiff's claims or for application of the rules of law and equity to collect sufficient funds from defendants to satisfy plaintiff's claims in the amount of €268,000,000 with interest at Euribor plus 8% from October 15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

H.   On the Eighth Claim for Relief against All Defendants for intentional fraudulent conveyances setting aside and annulling the conveyances to the extent necessary to satisfy the

claims for payment of PIK Notes or disregarding the conveyances and attach or levy execution from defendants upon the property conveyed to the extent necessary to satisfy plaintiff's claims or for application of the rules of law and equity to collect sufficient funds from defendants to satisfy plaintiff's claims in the amount of €268,000,000 with interest at Euribor plus 8% from December 27, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

I.   On the Ninth Claim for Relief against All Defendants for conveyances of partnership property setting aside and annulling the conveyances to the extent necessary to satisfy the claims for payment of PIK Notes or disregarding the conveyances and attach or levy execution from defendants upon the property conveyed to the extent necessary to satisfy plaintiff's claims or for application of the rules of law and equity to collect sufficient funds from defendants to satisfy plaintiff's claims in the amount of €268,000,000 with interest at Euribor plus 8% from October 15, 2009, and interest from November 27, 2009 to the date a judgment is satisfied in the amount of Euribor plus 9%, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

J.   On the Tenth Claim for Relief against the Private Equity Defendants for unjust enrichment, imposition of a constructive trust and an order to disgorge €268,000,000 with interest at Euribor plus 8% from October 15, 2009, together with the Trustee's fees, attorneys' fees and the costs and disbursements of this action.

K.   For such other, further or different relief as the Court deems just.

VIII.   <u>JURY DEMAND</u>

Cortlandt demands a trial by jury on all issues so triable.

<div style="margin-left: 50%;">

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

<u>/s/ Pilar G. Kraman</u>
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
The Brandywine Building
1000 N. West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

Jared B. Stamell
Andrew R. Goldenberg
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 566-4047
stamell@ssnyc.com

</div>

Dated:  December 21, 2011                    *Attorneys for plaintiff Cortlandt Street Recovery Corp.*